**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BUTTE DIVISION**

|  |  |
|---|---|
| ESTATE OF MICHAEL ROGEL, by and through its personal representative, MARY ROGEL,<br><br>Plaintiff,<br><br>vs.<br><br>CITY OF BOZEMAN, JUSTIN CHAFFINS, ZACHARY GARFIELD, HANNAH HELSBY, RYAN JEPPSON, JAMES MARVICH, JON OGDEN, SHAWN TORESDAHL, CODY YBARRA, and JOHN DOE DEFENDANTS 1-100,<br><br>Defendants. | **CV-24-034-BU-BMM**<br><br><br>**ORDER ON MOTION FOR SUMMARY JUDGMENT AND MOTION FOR A JURY SITE VISIT** |

**INTRODUCTION**

Defendant City of Bozeman ("Bozeman") and Defendants Justin Chaffins, Zachary Garfield, Hannah Helsby, Ryan Jeppson, James Marvich, Jon Ogden, Sergeant Shawn Toresdahl, and Cody Ybarra ("Officers") (collectively "Defendants"), separately filed motions for summary judgment. (Docs. 90, 100, 102, and 104.) Bozeman moves for partial summary judgment seeking dismissal of a claim pursuant to *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978), filed by Plaintiff Mary Rogel, as a Personal Representative for

1

the Estate of Michael Rogel, deceased ("Rogel"). (Doc. 91 at 6.) Officers move for summary judgment on all Rogel's claims asserted against them. (Docs. 101, 103, and 105.) Rogel opposes the motions. (Docs. 124 and 126.)

Defendants also jointly move the Court for a jury site visit to the scene of the incident at 259 Greenmore Court in Bozeman, Montana. (Doc. 114.) Rogel did not file a response to Defendants' motion for a site visit. The Court held a hearing on the motions on February 23, 2026. (Doc. 139.) Trial is scheduled to begin on March 30, 2026, in Butte, Montana. (Doc. 138.)

## BACKGROUND

Rogel had been diagnosed with schizoaffective disorder. (Doc. 72 ¶ 33.) Rogel suffered a mental health emergency at his home in Bozeman, Montana on April 3, 2023. (*Id.* ¶¶ 27–31.) Rogel called 911 seeking help. (*Id.* ¶ 28.) Rogel's mother also called 911 to inform the dispatcher of detailed information about Rogel's mental health crisis and to request help for him. (*Id.* 72 ¶¶ 37–38.)

Officer Ybarra reached Rogel via his cell phone and requested that Rogel exit his home without weapons. (Doc. 92 ¶ 4.) Rogel hung up on Ybarra after demanding that Ybarra provide Rogel with "the word of the day" and telling Ybarra to "come kill me." (*Id.*) Trained crisis negotiator, Officer Helsby, also attempted to contact Rogel via his cell phone. (*Id.* ¶ 5.)

Rogel left his home in his car with his dog before the Bozeman Police Department ("BPD") and Officers responded. (*Id.* ¶ 47.) Sergeant Toresdahl, the BPD Officer leading the response, did not immediately deploy BPD's Special Response Team ("SRT"), Bearcat, BPD's armored truck, or a mental health professional in response to Rogel's call. (Doc. 72 ¶¶ 39-46; Doc. 92 ¶ 7, Doc. 123 ¶ 7.) Officers pursued Rogel until Rogel's car became stuck at the end of a cul-de-sac located near 259 Greenmore Court. (*Id.* ¶ 49; Doc. 115 at 2.)

The residents of 259 Greenmore Court called 911 to inform dispatch that a person with a gun "came racing into [the] driveway." (Doc. 92 ¶ 9.) Bozeman and Officers allege that Rogel's position in the cul-de-sac was near two schools and an adjacent walking trail used by residents. (Doc. 92 ¶ 10.) Rogel contends that the nearby schools were located 1.5 miles away and that Officers had cleared the walking trail of people during the interaction with Rogel. (Doc. 123 ¶ 10.)

Officers drew their weapons and surrounded Rogel's car. (Doc. 72 ¶ 50.) Officers observed that Rogel had a rifle in his car. (Doc. 92 ¶ 11.) Officers positioned themselves to secure the surrounding area from the threat. (Doc. 92 ¶ 13.) Officers were positioned both in front and behind Rogel's car. Officers communicated with Rogel for approximately 30 minutes before firing non-lethal "bean bags" into Rogel's car. (Doc. 72 ¶¶ 53.) Officers contend that they deployed the bean bags to get a better line of vision into Rogel's car. Officers contend that Rogel failed to

3

follow commands to keep his hands away from his rifle during the interaction and that Rogel yelled threats at Officers. (Doc. 92 ¶ 15-16.) Officers claim that Rogel raised his rifle at Officers. Five of the eight Officers on scene fired twenty-seven lethal rounds into Rogel's car. (Doc. 92 ¶¶ 68-71.) Rogel and his dog died at the scene. (*Id.* ¶ 91.)

## LEGAL STANDARD

### I.    Summary Judgment

Summary judgment proves appropriate when the movant demonstrates "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those which may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine dispute of material fact requires sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id*. at 248.

### II.    Jury Site Visit

Granting or denying a motion for a jury site visit rests in the sound discretion of a district court. *V5 Techs., LLC v. Switch Ltd.*, 2021 U.S. Dist. LEXIS 218923, at*3 (D. Nev. Nov. 12, 2021) (quoting *Hughes v. United States*, 377 F.2d 515, 516 (9th Cir. 1967)) (internal quotation marks omitted).

## DISCUSSION

Bozeman moves the Court to enter summary judgment on Rogel's *Monell* claim. (Doc. 91 at 6.) Bozeman argues that Rogel's *Monell* claim, alleging that Bozeman systematically failed to adequately train, supervise, or discipline its law enforcement officers, fails as a matter of law because Rogel has identified no constitutionally deficient municipal policy or custom. (*Id.*)

Officers move the Court to enter summary judgment on all Rogel's claims asserted against them. (Docs. 101, 103, and 105.) Officers argue that they are shielded from liability of Rogel's federal constitutional claims based on qualified immunity, that Rogel's state law claims are barred, and that Rogel's punitive damages claims should be dismissed. (*Id.*) Officer Toresdahl additionally argues that he did not personally engage in conduct that caused Rogel's death. (Doc. 105 at 4-7.)

The Court first will address Bozeman's motion for partial summary judgment. The Court will then address Officers' motions for summary judgment. Lastly, the Court will address Defendants' joint request for a jury site visit.

## I.    Rogel's *Monell* Claim against Bozeman

Municipalities may be responsible under a § 1983 claim "when execution of a government's policy or custom . . . inflicts the injury that the government as an entity is responsible." *Monell*, 436 U.S. at 694. A court must address the following

factors in evaluating a municipalities *Monell* liability under § 1983: "(1) whether plaintiff's harm was caused by a constitutional violation, and (2) if so, whether the local government unit is responsible for that violation." *Miller v. City of Red Lodge*, 65 P.3d 562 (Mont. 2003).

Rogel must allege the following elements to show municipal liability under *Monell*: (1) that the plaintiff possessed a constitutional right of which he was deprived; (2) that the municipality had a policy; (3) that the municipality's policy amounts to deliberate indifference to the plaintiff's constitutional right; and (4) that the policy was the moving force behind the constitutional violation. *Plumeau v. Sch. Dist. No. 40 Cnty. of Yamhill*, 130 F.3d 432, 438 (9th Cir. 1997). Bozeman argues that Rogel failed to identify a deficient policy or custom of Bozeman or a policy that amounts to deliberate indifference even assuming Rogel's Fourth Amendment rights were violated. (Doc. 91 at 17.)

Rogel alleges that Bozeman failed to properly implement training, supervise, or discipline its law enforcement officers to support his *Monell* claim. (Doc. 72 ¶¶ 157-160.) Rogel asserts that the failures to implement training, supervise, or discipline establishes Bozeman's deliberate indifference to use-of-force incidents and mental health emergencies. (*Id.*) Rogel's experts suggest that Officers may have been "sufficiently trained" but failed to properly implement these trainings systemically and on the day of Rogel's death. (Doc. 124 at 3.) Rogel asserts that

these material, undisputed facts establish that Bozeman had insufficient policies and customs to defeat summary judgment. (*Id*. at 2.)

Rogel's relevant evidence produced to support his *Monell* claims relates to Officers alleged failures to follow their training during the encounter with Rogel on April 3, 2023. (*Id*. at 7.) Rogel contends that these actions and customs show the lack of supervisory and disciplinary systems employed by Bozeman. (Doc. 124 at 7.) Defendants correctly note that one incident of inadequate training may prove insufficient to support a *Monell* claim. (Doc. 91 at 18 (citing *Hyde v. City of Willcox*, 23 F. 4th 863, 875 (9th Cir. 2022)).

Rogel alleges that Officers' failure to implement their training in the encounter with Rogel on April 3, 2023, and in other circumstances in response to mental health crises, demonstrates the flaws in the training in support of his *Monell* claim. Rogel's *Monell* claim does not hinge solely on evidence suggesting that Bozeman had inadequate training policy in place that caused Rogel's death. Rogel further argues that Bozeman lacked procedures or customs for law enforcement officers to use their training when responding to people in times of crisis. Rogel's experts admit that Officers "were sufficiently trained." (Doc. 125-1 at 28.) Rogel's claims that the alleged custom of BPD law enforcement officers routinely ignoring training in response to mental health crises, however, creates a genuine issue of material fact to defeat summary judgment.

Rogel points to Bozeman's data showing that deadly force incidents remain rare to show that Bozeman law enforcement officers may not be adequately prepared, and, therefore, likely not capable of implementing the training provided for situations like the one with Rogel. (Doc. 124 (citing Doc. 92 at 8)). Rogel has shown that Bozeman's data on use of force incidents suggests that Bozeman may have a custom of ignoring or failing to implement their training when responding to situations that involve a distressed person. Rogel has alleged an inadequate policy or custom of Bozeman that results in law enforcement officers failing to implement their crisis training when responding to a person struggling with a mental health crisis. (Doc. 124 at 6.)

Rogel alleges that this deficient Bozeman practice or custom leads law enforcement officers to turn to lethal force rather than using de-escalation tactics. Rogel notes that Bozeman's systemic failures stem from supervisory, command, or control inadequacies and customs that lead to tragic situations like the encounter with Rogel. Rogel's experts opine that Bozeman appears to have policy-level deficiencies in their training programs that support Rogel's claim that a genuine issue of material fact exists on his *Monell* claim.

Rogel also contends that evidence of the Bozeman Bingo game from 2025 provides support of his *Monell* claims. Rogel argues that the Bingo game demonstrates "departmental culture, supervision, and training" reflecting

Bozeman's "attitudes toward use-of-force events and post-incident normalization of lethal outcomes." (Doc. 124 at 6.) The Bingo games took place in 2025, nearly two years after the deadly encounter with Rogel. The Court does not find that this evidence proves relevant to whether Bozeman implemented or had a deficient policy, practice, or custom that caused Rogel's death in 2023. No evidence suggests that law enforcement officers were participating in the Bingo game at the time of the incident with Rogel.

Rogel correctly notes that the element of deliberate indifference in a *Monell* claim may be inferred from a single incident if the constitutional violation proves "so inconsistent with constitutional rights," *Tai Tam, LLC v. Missoula Cty.*, 520 P.3d 312 (Mont. 2022), or when the failures are "patently obvious." *Hyde,* 23 F. 4th at 875 (quoting *Connick*, 563 U.S. at 61)). Rogel's allegations of deliberate indifference stem from Officers' failures to address properly Rogel during a mental health crisis. Officers knew that Rogel was suffering from a mental health crisis from the information received from Rogel and his mother over the phone.

Rogel offers evidence that Officers disregarded consequences to Rogel in its failures to employ mental health professionals, or timely deploy the SRT, bearcat, and other non-lethal resources onto the scene initially. The jury remains the proper factfinder in deciding whether Officers' actions rose to the level of deliberate indifference on this occasion. The determination of whether a defendant acts with

9

deliberate indifference remains a question of fact. *Mellen v. Winn*, 900 F.3d 1085, 1101 (9th Cir. 2018).

Rogel sufficiently has shown at this stage in the proceedings that Bozeman law enforcement officers and supervisors allegedly ignore certain crisis negotiation training when faced with an escalated situation involving a mentally instable person. Rogel alleges that this inadequate response custom and practice of Bozeman has a causal connection to Rogel's tragic death that occurred on April 3, 2023. Rogel's asserts that his experts opine on how Bozeman's customs "directly contributed to the constitutional violations" and were a moving force behind the alleged constitutional injury. (Doc. 124 at 6; Doc. 123-1 at 27.)

The Court declines to grant summary judgment to Bozeman on Rogel's *Monell* claim. A reasonable jury could return a verdict for Rogel on the issue of whether Bozeman's inadequate custom or policy inflicted a constitutional injury on Rogel. Rogel has provided other relevant evidence, beyond the single incident of Bozeman's failure to implement training, supervise, and discipline Officers on the day in question, that supports Rogel's *Monell* claim. Rogel created a genuine issue of material fact that Bozeman's customs and practices caused Rogel's death. The Court denies Bozeman's motion for partial summary judgment on Rogel's *Monell* claims.

## II.    Rogel's claims against Officers

Rogel alleges violations of Rogel's federal civil rights and asserts state law claims against Officers arising from the encounter between Rogel and Officers on April 3, 2023. (Doc. 72 ¶¶ 144-147.) Rogel alleges that Officers used excessive force in violation of Rogel's Fourth Amendment rights, deprived Rogel of life without due process under the Fourteenth Amendment, and inflicted emotional distress. (*Id*.) Rogel also alleges a punitive damages claim against Officers. (*Id*.)

Officers argue that they are entitled to summary judgment on all claims for various reasons. (Docs. 101, 103, and 105.) Officers first contend that they are entitled to qualified immunity on Rogel's § 1983 claims and Fourteenth Amendment substantive due process claims. (Docs 101 at 8, 103 at 7, and 105 at 3.) Second, Officers argue that Rogel's Montana state law claims are barred because Officers were acting in the course and scope of their employment. (Docs. 101 at 8, 103 at 7-8, and 105 at 3.) Lastly, Sergeant Toresdahl ("Toresdahl") contends that he cannot be liable for the actions of the other Officers and that he did not participate in the alleged constitutional violations. (Doc. 105 at 2.) The Court will address Officers' arguments.

### A. Whether Officers are entitled to qualified immunity on Rogel's excessive force claims.

Government officials sued in their individuals' capacities under 42 U.S.C. § 1983 may raise the affirmative defense of qualified immunity. *Estate of Simpson*, 229 F. Supp. 3d 1192, 1201 (D. Mont. 2017). "The doctrine of qualified immunity

11

protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks omitted). A court must ask the following two question when evaluating a grant of qualified immunity: "(1) whether, taking the facts in the light most favorable to the nonmoving party, the officers' conduct violated a constitutional right, and (2) whether the right was clearly established at the time of the alleged misconduct." *Glenn v. Washington*, 673 F.3d 864, 870 (9th Cir. 2011) (citations omitted.) Qualified immunity must be granted if a court answers 'no' to either prong. *Vos v. City of Newport Beach*, 892 F.3d 1024 (9th Cir. 2018).

A court must analyze excessive force claims under the *Graham* "reasonableness" standard. *Estate of Simpson*, 229 F. Supp. 3d 1192, 1202 (D. Mont. 2017). *Graham's* reasonableness inquiry involves balancing "the 'nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interest at stake." *Graham*, 490 U.S. at 396 (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985). Courts should grant summary judgment "sparingly" in excessive force cases because the inquiry nearly always "requires a jury to sift through disputed factual contentions and draw inferences therefrom." *Glenn v. Washington County*, 673 F.3d 864, 871 (9th Cir. 2011).

      **1. Whether Officers conduct violated Rogel's constitutional rights under *Graham's* reasonableness inquiry**

The qualified immunity analysis requires a court to analyze whether the facts, taken in the light most favorable to the party asserting injury, show that the officer's conduct violated a person's federal right. *Id.* A party asserting excessive force grounds its claims in the party's Fourth Amendment right against unreasonable seizures. *Graham v. Conner*, 490 U.S. at 394. The analysis of qualified immunity and excessive force under *Graham* involves "an objective one" with the question being "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397.

A court evaluates the reasonableness of the officers' conduct "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396. A court may consider information known to the officer at the time of the shooting. *Deorle v. Rutherford*, 272 F.3d 1272, 1281 (9th Cir. 2001). A law enforcement officer may use deadly force "where 'the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others.'" *J.A.L. by and through Valdez v. Santos*, 724 Fed. Appx. 531, 533 (9th Cir. 2018) (quoting *Tennessee v. Garner*, 471 U.S. 1, 3 (1985)).

A court must balance and evaluate the following criteria to determine whether an officer's conduct was unreasonable and violates the Fourth Amendment: (1) the type and amount of force inflicted, *Espinosa v. City and Cnty. of S.F.*, 598 F.3d 528,

13

537 (9th Cir. 2010); and (2) the government's interest in the force used. *Glenn*, 673 F.3d at 872. A court considers the following three factors in determining whether the government's interest justified the use of force: (1) "the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officer or others; and (3) whether [the suspect] is actively resisting arrest or attempting to evade by flight." *Yoakum v. Crook County*, 2024 WL 2749525, at *5 (D. Or. Apr. 24, 2024) (citing *Graham*, 490 U.S. at 396). A court also may consider other relevant factors such as the availability of less intrusive alternatives, whether the officers provided proper warnings, and whether it should have been apparent to the officers that the person who forced was used against was emotionally disturbed. *Isayeva v. Sacramento Sheriff's Dep't*, 872 F.3d 938, 947 (9th Cir. 2017) (citing *Glenn*, 673 F.3d at 872).

The amount of force used by Officers varied. (Doc. 103 at 18; 101 at 14.) For example, it appears that some Officers initially employed non-lethal bean bag shots at Rogel during the encounter. (Doc. 103 at 18.) These Officers, Helsby and Garfield, argue that no evidence exists that the bean bags injured or struck Rogel. (*Id*.) Officer Ybarra argues that his force was minimal compared to other Officers and that Rogel's claims that he failed to keep Rogel on the phone prove insufficient. (Doc. 101 at 7 and 13-14.) Ybarra contends that he used force only when he shot out

Rogel's rear car windows with a bean bag shotgun. (*Id*. at 14 and 18.) Ybarra claims that he did not aim the bean bags at Rogel or direct any force on Rogel. (*Id*. at 18.)

The Ninth Circuit has acknowledged the dangerousness of the use of a bean bag, noting that, "though less than deadly, . . . [such use of force] is permissible only when a strong governmental interest compels the employment of such force." *Glenn*, 673 F. 3d at 872 (quoting *Deorle*, 272 F. 3d at 1280). Ultimately, the amount of force used by the other Officers was the most severe kind of force available. *See Estate of Simpson*, 229 F. Supp. 3d at 1203; *Garner,* 471 U.S. at 9. Officers Chaffins, Helsby, Marvich, Garfield, and Jeppson all fired lethal shots at Rogel.

The Court now must weigh whether the government's interest justified its use of the most severe kind of force available against Rogel. Officers argue that they had to shoot Rogel because of the severity of the situation and because Rogel posed a dangerous threat to Officers and the public. (Doc. 103 at 20-21.) Officers were called by both Rogel, who was experiencing a mental health crisis, and Rogel's mother, who confirmed her son's mental health crisis. (*Id*. at 20.)  Rogel's mother confirmed that Rogel possessed a weapon, and Officers later observed a rifle in the front seat of Rogel's car. (*Id*.)

Officers contend that Rogel had made verbal threats to Officers. (*Id*. at 21.) Officers argue that Rogel's actions created an unsafe environment in the cul-de-sac near occupied houses and a public walking trail. (*Id*.) Officers argue that Rogel failed

to comply with numerous commands by Officers, including to remain at his residence, to communicate with Officers via his phone, and to keep his hands away from the rifle. (*Id*. at 21-23.) Officers allege that they observed Rogel pointing the rifle at Officers. (*Id*. at 22.) Five Officers at that time simultaneously fired lethal rounds into Rogel's car, killing Rogel. (*Id*.)

Officers further argue that the additional factors also weigh in their favor. (*Id*. at 23.) Officers note that they engaged many less intrusive alternatives before the use of lethal force. (*Id*.) For example, Officers first attempted to communicate directly with Rogel without their physical presence. (*Id*.) Officers claim that they properly considered that Rogel was experiencing a mental health crisis. (*Id*. at 24.) Officers used Helsby, a trained Crisis Negotiator, to attempt to de-escalate the situation and Rogel's mental health episode by speaking calmly and directly to him and to his mother before force was used. (*Id*.) Officers also deployed non-lethal bean bags into Rogel's car before using lethal bullets to subdue Rogel. (*Id*. at 23-24.)

Rogel disputes Officers' characterization of the encounter. (Doc. 126 at 12.) Rogel contends that the severity of Rogel's crime was minimal, as Officers had been called to do a welfare check on Rogel, not to arrest a potential criminal. (*Id*.) Rogel argues that Rogel did not pose a threat to the public or officers because Officers had set the perimeter and cleared the nearby homes and walking trail. (*Id*.) Rogel also contends that genuine factual disputes exist over Rogel's use of the rifle, given that

16

the rifle was unloaded and not positioned in a way to allow Rogel to fire the rifle quickly. (*Id*. at 2-3 and 12; Doc. 125-7.) Rogel claims that Rogel made no movements to harm anyone during the encounter to prompt Officers to fire their weapons at Rogel. (*Id*. at 12.) These claims leave in dispute the "most important" *Graham* factor as to the level of threat Rogel posed to Officers immediately before the shooting. *See Estate of Aguirre v. Country of Riverside*, 29 F.4th 624, 628 (9th Cir. 2022) (citations omitted). Rogel and Defendants dispute a key fact of whether Rogel actually raised his rifle at Officers to prompt the deadly force.

Rogel further asserts that Rogel did not resist or attempt to evade Officers. (*Id*. at 12-13.) Rogel argues that Rogel stayed within his car and never attempted to escape. (*Id*. at 13.) Rogel notes that "ample less intrusive alternative" existed but were not used before Officers turned to lethal force. (*Id*.) Rogel contends that Officers alleged de-escalation tactics, like the deployment of the bean bags, actually escalated the interaction by killing Rogel's dog. (*Id*.) Rogel argues that Officers' delayed response to call the Special Response Team ("SRT") or to implement a Mobile Crisis Unit ("MBT") evidences a lack of use of available and less intrusive alternatives. (*Id*.) Rogel finally claims that Rogel's mental health crisis was undisputed and unquestionable. (*Id*. at 14.) Rogel contends that Officers possessed all the necessary information regarding Rogel's mental health episode and improperly responded with lethal force. (*Id*.)

17

The record shows that disputed material facts remain on whether Officers' conduct proved objectively reasonable under the totality of the circumstances. A reasonable jury could conclude, given the "sufficient indications of mental illness" exhibited by Rogel, that Bozeman's interest in using deadly force was diminished and unjustified. *Longoria v. Pinal County*, 873 F.3d 699, 708 (9th Cir. 2017). The Court cannot resolve on summary judgment the question of whether Officers' conduct was objectively reasonable and violated Rogel's Fourth Amendment Rights.

### 2.  Whether Rogel had a clearly established right

A court must determine whether the right in question was clearly established at the time of the alleged violation to grant qualified immunity. *Tolan*, 572 U.S. at 656. "If the law at that time did not clearly establish that the officer's conduct would violate the Constitution, the officer should not be subject to liability or, indeed, even the burdens of litigation." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004).

"A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam). The clearly established law requirement does not require that there be a direct factually similar case on point, but that "existing precedent must place the lawfulness of the particular [action] beyond debate." *Gonzales v. City of Phoenix*, 163 F. 4th 1289 (9th Cir. 2026) (citing *Dist. Columbia v. Wesby*, 583 U.S. 48 (2018)). A court must

18

answer the question of "whether the state of the law [at the time of the alleged misconduct] gave [Officers] fair warning that their alleged treatment of [Rogel] was unconstitutional." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

Rogel argues that his Fourth Amendment rights to be free from excessive force were clearly established on April 3, 2023. (Doc. 126 at 4.) Rogel asserts that existing caselaw at the time of Rogel's death "made clear" to law enforcement officers that officers could "not use deadly force against a non-threatening individual even if the individual is armed, and even if the situation is volatile." (Doc. 126 at 4. (quoting *Estate of Aguirre v. County of Riverside*, 29 F.4th 624, 629 (9th Cir. 2022) (citations omitted). For example, in *George v. Morris*, the Ninth Circuit concluded that the police officers used excessive force after having fatally shot a suspect who emerged from his home with a firearm pointed down. 736 F.3d 829, 832-33 (9th Cir. 2013).

The law enforcement officers in *George* were responding to a domestic disturbance call. *Id*. *George* acknowledged the dangerousness of the situation to the law enforcement officers but declined to conclude as a matter of law that the officers were reasonable in shooting the suspect who had his gun pointed to the ground. *Id*. at 838-39. *George*, published ten years before the incident with Rogel, put Officers on notice that absent "objective provocation," Officers could not

19

fatally shoot an armed, non-threatening suspect. *Id*. Officers may not ignore "disputed evidence." *Aguirre*, 29 F.4th at 630.

Officers were faced with a potentially dangerous and volatile situation with Rogel, who possessed a firearm. The Court at this stage must accept Rogel's version of facts. *See Aguirre*, 29 F.4th at 630. Whether Rogel actually had posed a threat to Officers or raised his rifle toward Officers immediately before the shooting remains disputed. Like the Ninth Circuit explained in *George*, if indeed Officers shot Rogel without objective and serious provocation, while Rogel was in possession of a rifle, a reasonable jury could find that Officers violated Rogel's Fourth Amendment rights. *George*, 736 F.3d at 831. Officers were put on notice not to use deadly force, even in potentially volatile situations with an armed subject, if the individual appears non-threatening. *Id*.

The Court finds that Rogel had a clearly established right to be free from deadly force on April 3, 2023, when viewing the facts most favorably to Rogel and due to the factual similarity to *George*. Material factual disputes remain on whether Rogel posed an immediate threat to Officers with his rifle as some disputed evidence shows that Rogel's rifle was not positioned toward Officers during the shooting. (Doc. 126 at 2.) Rogel's rifle was found lodged between the driver's seat and console to support Rogel's claims. (Doc. 125-7.)

A court "must carefully examine all the evidence in the record . . . to determine whether the officer's story is internally consistent and consistent with other known facts.'" *Cruz v. City of Anaheim*, 765 F.3d 1076, 1079 (9th 2014) (quoting case). Existing caselaw like *George* shows that Rogel had a clearly established right to be free from excessive force if, as Rogel claims, he did not raise his rifle at Officers. Officers' body-cam footage show where Rogel's rifle position was lodged between the driver's seat and console following the fatal shots. (*See* Doc. 125-7.) Rogel's final rifle position appears relevant and may support the claim that Rogel did not raise his gun toward Officers before being fatally shot. The Court "may not simply accept what may be a self-serving account by the police officer." *Zion v. Cty. of Orange*, 874 F.3d 1072, 1076 (9th Cir. 2017). This skepticism arises '[b]ecause the person most likely to rebut the officers' version of events—the one killed—can't testify." *Cruz*, 765 F.3d at 1079.

Officer Ybarra did not fire lethal shots at Rogel during the encounter. No evidence suggests that the bean bags caused physical injury or deadly force to Rogel. Rogel contends, however, that Ybarra's actions of firing the less lethal bean bags into Rogel's car escalated and intensified the situation to further agitate the already distressed Rogel. Rogel also suggest the bean bag rounds caused injury and the eventual death of Rogel's dog, who was in the car with him. Ybarra's conduct, although non-deadly, could have resulted in deadly force as the bean bag rounds

were shot into Rogel's car and in Rogel's direction. Rogel had a clearly established right to be free from this potentially lethal force, when drawing reasonable inferences in Rogel's favor. If Rogel's actions did not constitute as objective provocation, warranting the use of force, Ybarra should have refrained from firing the bean bag into Rogel's car.

The Court cannot grant Officers qualified immunity as a matter of law when carefully viewing all the facts in the record. A reasonable fact finder could conclude that Officers' use of force proved excessive. It remains disputed whether Rogel made any movement, gesture, or serious threat to Officers when drawing all reasonable inferences in Rogel's favor. The evidence of Rogel's rifle position would suggest that Rogel had a clearly established Fourth Amendment right to be free from deadly force by Officers under the analysis applied in *George* and *Estate of Aguirre*.

The Court declines to grant Officers qualified immunity on the current record, after consideration of *Graham* factors and viewing the facts in the light most favorable to Rogel. The jury remains the proper factfinder to determine whether Officers' conduct proved excessive under the circumstances. The Court denies Officers' motion for summary judgment on Rogel's § 1983 claim.

### B. Whether Sergeant Toresdahl's is entitled to qualified immunity based on supervisory liability

Toresdahl argues that "[t]here can be no supervisory liability in the absence

22

of an underlying constitutional violation by subordinates." (Doc. 105 at 3 (citing *Puente v. City of Phoenix*, 123 F.4th 1035, 1064 (9th Cir 2024). The Court determined that Toresdahl's subordinate Officers were not entitled to qualified immunity. The Court concluded that the jury remains the proper factfinder to evaluate whether Toresdahl's subordinates engaged in alleged constitutional violations. As a result, Toresdahl's qualified immunity argument on this basis also fails.

### C. Whether Rogel's has asserted a viable Fourteenth Amendment Substantive Due Process Claim against Officers

Rogel alleges that Officers deprived Rogel of life and liberty without due process of the law under a Fourteenth Amendment substantive due process violation. (Doc. 72 ¶¶ 146-47.) Officers argue that Rogel's substantive due process claim is barred because Rogel's claims that Officers used excessive force must be analyzed solely under the Fourth Amendment. (Doc. 103 at 26-27 (citing *Graham*, 490 U.S. at 395-97).) Officers contend that the challenged conduct of Rogel's substantive due process claim rests on the same conduct as its excessive force claim pursuant to § 1983. (Doc. 103 at 27.)

Officers rely on *Albright v. Oliver*, 510 U.S. 266, 271 (1994), where the U.S. Supreme Court held that a § 1983 claim provides the avenue to allege violations of specific constitutional rights. In *Armendariz v. Penman*, for example, the Ninth Circuit rejected a party's substantive due process claim when another amendment

directly governed the challenged conduct. 75 F.3d 1311, 1324-26 (9th Cir. 1996). Rogel's substantive due process claims relate to Officers conduct in handling Rogel's mental health crisis, alleged inadequate response, and Officers' use of force causing Rogel's death. The Court generally must evaluate excessive force claims under *Graham's* standard of reasonableness and the Fourth Amendment.

Rogel counters that it holds a separate substantive due process claim regarding the deprivation of familial association that is not barred by *Graham*. (Doc. 126 at 15 (citing *Zion v. Cty of Orange*, 874 F.3d 1072, 1076-77 (9th Cir. 2017).) *Zion* recognized that a party's familial association substantive due process claim could survive because that claim "alleges a different constitutional violation under the Due Process Clause." 874 F.3d at 1077. "Conduct that 'shocks the conscience' violates due process." *Id*. The officer in *Zion* did not violate the Fourteenth Amendment when he emptied his weapon into the victim. *Id.* The Fourteenth Amendment violation arose when the officer followed up the volley of shots by "walking around the victim for several seconds" and then returning to stomp on the victim's head. *Id.* The Ninth Circuit noted that the officer "even takes a running start before each strike." *Id.* The Due Process Clause protects against this kind of "brutal" conduct. *Id.* (citations omitted).

Rogel argues that Officers' use of force as related to his familial association claim shocks the conscience to support this familial association claim. (Doc. 126 at

24

16.) The Court disagrees. Rogel must establish either (1) that Officers acted with deliberate indifference, or the more stringent standard (2) that Officers "acted with 'a purpose to harm without regard to legitimate law enforcement objectives,'" depending on the amount of time Officers had to deliberate. *Zion,* 874 F.3d at 1077 (quoting *Porter v. Osborn*, 546 F.3d 1131, 1133 (9th Cir. 2008)). The consideration falls on "whether the circumstances are such that 'actual deliberation' is practical." *Porter*, 546 F.3d at 1137 (quoting *Moreland v. Las Vegas Metro. Police Dept.*, 159 F.3d 365, 372 (9th Cir. 1998)). When situations remain in flux or evolve rapidly, the Ninth Circuit has applied the narrow "purpose to harm" standard. *See Porter,* 546 F.3d at 1140.

The proper standard of culpability for the due process right to familial association that applies to these facts is whether Officers had the "purpose to harm without regard to legitimate law enforcement objectives applies." *Zion,* 874 F.3d at 1077. Nothing like the brutality in *Zion* occurred here. The encounter with Rogel spanned nearly thirty minutes. It appears that the situation remained in constant flux where Officers continued to have to make split second decisions on their actions. There were communication and compliance by Rogel at some points, contrasted with confusion, yelling by Officers, and threats made by Rogel. The situation with Rogel appeared to quickly evolve and escalate after failed attempts to communicate with Rogel. Courts have declined to conclude that "deliberation"

must be construed narrowly or limited solely to the amount of time law enforcement officers may have had for deliberation. *See Lewis*, 523 U.S. at 851 n. 11. Rogel's alleged actions of failing to keep his hands away from his weapon and reaching for his rifle as contended by Officers, forced Officers to react quickly in deciding to use lethal force.

Rogel has failed to show Officers actions "shocked the conscience" under the purpose to harm standard. A purpose to harm may be evidenced by law enforcement actions "where force against a suspect is meant only to 'teach him a lesson' or to 'get even.'" *Porter*, 546 F.3d at 1140 (quoting *Davis v. Township of Hillside*, 190 F.3d 167, 172-73 (3d. Cir. 1999) (McKee, J. concurring)). For example, in *Est of Hernandez v. City of Los Angeles*, the Ninth Circuit determined that a law enforcement officer's conduct in firing an additional 5-6 shots after having subdued the plaintiff and having eliminated any immediate threat did not rise to the level of shocking the conscience. 96 F.4th 1209, 1221-23 (9th Cir 2024), *aff'd in relevant part*, 139 F.4th 790 (9th Cir 2025) (en banc). The law enforcement officer continued shooting at the plaintiff while the plaintiff was lying on the ground facing away and rolling away from the law enforcement officers. *Id*. at 1219. The Ninth Circuit concluded that the district court properly granted the defendant's summary judgment on the Fourteenth Amendment due process claim. *Id*. at 1223.

Courts have held that triable issues may remain on whether an officer used excessive force, while simultaneously dismissing a plaintiff's Fourteenth Amendment claims because an officer's conduct may not meet the standard of showing a due process violation. *See Nehad v. Browder*, 929 F.3d 1125, 1134, 1139 (9th Cir. 2019); *Zion*, 874 F.3d at 1077. The Court similarly finds that triable issues remain on whether Officers used excessive force, but that Rogel's Fourteenth Amendment substantive due process claim fails. Rogel has failed to establish that Officers actions "shocked the conscience."

The undisputed facts establish that Officers attempted to communicate with Rogel and resolve the situation for approximately 30 minutes before making a split-second decision to use deadly force. Officers contend that they used deadly force only after Rogel had made verbal threats of force to Officers and only after Officers observed Rogel raise his rifle toward them. When Officers allegedly observed Rogel raise his rifle, Officers lacked time to deliberate on whether to use deadly force, as evidence by the nearly simultaneous firing by Officers and the absence of any command to shoot. Officers argue that they fired at Rogel to ensure Officer safety and public safety in and around the occupied cul-de-sac. Officers' decision to fire fatal shots at Rogel was not done solely to harm Rogel or to "teach [Rogel] a lesson." *Davis*, 190 F.3d at 172-73.

Officers have established that their actions, regardless of whether excessive, were taken for the legitimate purpose of protecting Officers and the public. *Est of Hernandez*, 96 F.4th at 1221-23. Officers' actions do not rise to the level of having acted "with a purpose to harm without regard to legitimate law enforcement objective." *Zion*, 874 F.3d at 1077. Rogel's Fourteenth Amendment substantive due process claim fails as a matter of law.

### D. Whether Sergeant Toresdahl may be personally liable for his supervisory conduct

Toresdahl finally argues that he can be liable as a supervisor only for his own acts, not those acts of his subordinate Officers. (Doc. 105 at 4 (citing *Starr v. Baca*, 656 F.3d 1202, 1206 (9th Cir. 2011). A supervisory defendant may be liable only if he personally participated in the violation or if there is a "sufficient causal connection" between his own wrongful conduct and the constitutional injury. *Starr*, 652 F.3d at 1207 (quoting *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir 1989)). A plaintiff may establish this causal connection by showing that the supervisory defendant "set[] in morion a series of acts by others" or by "knowingly refus[ing] to terminate a series of acts by others, which [the supervisor] knew or reasonably should have known would cause others to inflict a constitutional injury." *Dubner v. City & Cnty. of San Francisco*, 266 F.3d 959, 968 (9th Cir.2001).

Toresdahl was not directly involved in the alleged excessive force used against Rogel. (Doc. 105 at 5.) Toresdahl did not engage either in the firing of non-

lethal bean bags or by firing his weapon personally at Rogel. (*Id*.) Toresdahl argues that he did not "engage in any conduct or fail to stop his officers from engaging in any conduct which he knew or should have known would cause them to shoot Rogel." (Doc. 105 at 5.) The Court disagrees.

Toresdahl argues that the requisite causal connection between his acts and the acts of the officers does not exist. (Doc. 105 at 5.) Toresdahl contends that his actions of coordinating the response of Officers and attempts to de-escalate the situation by talking with Rogel show that he did not engage in conduct or fail to stop Officers from engaging in the conduct that caused them to shoot Rogel. (*Id*. at 5-6.) Toresdahl claims that he promptly activated the SRT and called for the Bearcat to the scene for less lethal alternatives after the efforts to communicate with Rogel failed. (*Id*. at 7.) Toresdahl contends that his actions of attempting to de-escalate the situation could have caused Rogel "to aim his gun at [Officers] or force them to shoot him to defend themselves." (*Id*. at 7.)

To the contrary, Rogel alleges that Toresdahl did act, or failed to act, in a way that he knew or reasonably should have known would cause Officers to inflict a constitutional injury on Rogel. (Doc. 126 at 13.) Rogel asserts that in his leadership role, Toresdahl, caused constitutional injury to Rogel by failing to timely engage mental health professionals to provide support to Rogel and Officers during the encounter. (*Id*.) Rogel claims that Toresdahl's refusal to timely deploy SRT deprived

29

Officers the use of the Bearcat and less lethal alternatives. These actions by Toresdahl are alleged to have set Officers into action by inadequately responding to Rogel's situation and mental health crisis. (*Id*.) Rogel alleges that Rogel was fatally shot, and his constitutional rights violated because of Toresdahl's supervisory failures.

Genuine issues of material fact exist to defeat summary judgment in favor of Toresdahl. Questions for the jury remain on whether Toresdahl's supervisory actions and leading role in the response to Rogel caused Rogel's alleged constitutional injuries. The Court denies summary judgment to Toresdahl on the basis that his supervisory conduct had no bearing on Rogel's injury.

### E.  Rogel's State Law Claims against Officers

Officers argue that Officers are immune from Rogel's Montana state law claims pursuant to Mont. Code Ann. § 2-9-305(5). (Doc. 103 at 27-28.) Officers argue that Mont. Code Ann. § 2-9-305(5) bars recovery from both a governmental entity and individuals acting on behalf of the governmental agency when the allegations arise from the same conduct. (*Id.* at 28 (citing *Kiely Construction, LLC v. City of Red Lodge*, 57 P.3d 836 (Mont. 2022)). The Court previously dismissed Rogel's state law claims against Officers (Doc. 38.) The Court explained that Mont. Code Ann. § 2-9-305(5) immunizes individual government employees from state

30

law tort claims if the employees were acting within the course and scope of their employment. (*Id*.)

The parties have agreed that Officers were acting in the course and scope of their employment during the encounter with Rogel on April 3, 2023. (Doc. 125 ¶ 1.) Rogel does not dispute that Officers are the proper party for his federal law claims, not Montana state law claims. (Doc. 126 at 17.) No genuine issue of material fact remains regarding whether Officers are immune from Rogel's state law claims. The Court dismisses any remaining Montana state law claims against Officers.

### F.  Rogel's Punitive Damages Claim against Officers

A plaintiff may be entitled to punitive damages on a § 1983 claim against an individual defendant when the defendant's actions are motivated by oppressive or malicious intent or when a defendant's actions involve a reckless or callous disregard to a plaintiff's rights. *Smith v. Wade*, 461 U.S. 30, 56 (1983); *Dang v. Cross*, 422 F.3d 800, 807 (9th Cir. 2005). Malicious conduct involves conduct that was done by ill will or spite or for the purpose of injuring the plaintiffs. *Dang*, 422 F.3d at 807. "Conduct is in reckless disregard of a plaintiff's rights if, under the circumstances, it reflects complete indifference to the plaintiff's . . . rights, or if the defendant acts in the face of a perceived risk that its actions will violate the plaintiff's rights under federal law." *Id*. (citing Model Civ. Jury Instr. 9th Cir. 5.5 (2025) (previously numbered 7.5 (2004)). The determination of whether a defendant acts with reckless

disregard or deliberate indifference remains a question of fact. *Mellen*, 900 F.3d at 1101.

No evidence supports the finding that Officers acted with malicious intent. Rogel argues that Officers conduct rises to the level of a reckless disregard to support his punitive damages claim. (Doc. 126 at 16.) Officers assert that their actions do not support a punitive damages claim because Officers initially attempted to evaluate the situation with non-deadly force alternatives to avoid use of deadly force. Officers argue that they took actions to avoid risks to Rogel. Rogel counters Defendants' contentions by showing that facts suggest that Officers may have acted recklessly and without acknowledging the risks to Rogel.

Rogel was suffering a mental health crisis. Officers were aware Rogel was suffering from this mental health episode. Rogel alleges that Officers disregarded consequences to Rogel in its failures to employ mental health professionals, or timely deploy the SRT, bearcat, and other non-lethal resources onto the scene initially. Officers ultimately used deadly force on Rogel during an encounter called in as a welfare check. Disputed facts remain. A reasonable juror could conclude that Officers' response to Rogel involved "a reckless disregard to a plaintiff's rights" on the current record. *Smith*, 461 U.S. at 56. The Court denies summary judgment on Rogel's punitive damages claims.

## III.    Defendant's Motion for a Jury Site Visit

Defendants ask the Court to conduct a jury site visit to the scene of the incident at 259 Greenmore Court in Bozeman, Montana. (Doc. 115 at 2.) Defendants argue that the body cam footage and photographs do not accurately portray the incident scene and that Defendants cannot physically bring the scene into the courtroom at trial. (Doc. 115 at 3.) Defendants explain that the jury should be able to see the scene in question firsthand when evaluating Rogel's claims. (*Id.*)

Defendants argue that its liability expert, Greg Meyer, acknowledged that the distances in real life "are much closer than they appear on body-worn cameras." (Doc. 92-13 at 130.) Defendants note that the distances between Rogel and other homes, the predestination path, and Rogel's residence at 259 Greenmore informed Officers responses on the day in question. (Doc. 115 at 3.) Defendants also argue that Rogel's expert, Adam Bercovici, has never visited the scene or measured the relevant distances and notes determination of distanced may be difficult from body-worn cameras. (Doc. 115-1 at 65:20-24, 66:3, and 69:12.)

The Court declines to exercise its discretion to allow a jury site visit to 259 Greenmore Court in Bozeman, Montana during the trial scheduled for March 31, 2026. *Hughes,* 377 F.2d at 516. The trial is scheduled in Butte, Montana, approximately 85 miles from the scene in Bozeman. Logistically planning and conducting a jury site visit appears impracticable and unnecessary under the circumstances.

The Court notes generally that videos and photos shown at trial will almost never provide the entire picture of a scene or context for juries. This drawback alone does not warrant a jury site visit absent extraordinary circumstances. Defendants do not argue or contend that they are lacking the footage to depict the scene on the day of the incident. Defendants have video and photos to sufficiently show the scene in the cul-de-sac at 259 Greenmore Court.

Defendants' arguments do not persuade the Court to exercise its discretion for a jury site visit in this matter. The jury will be capable of understanding the distances as shown and explained. The Court denies Rogel's motion in limine seeking to exclude evidence of the body-worn camera deficiencies and distance discrepancies. Both parties' experts acknowledged that the body cam footage does not entirely show the scene. (*See* Docs. 92-13 at 130, Doc. 115-1 at 4-5.) The parties may make arguments to the jury of what may not be fully depicted by the body cam footage. Defendants further remain free to argue that Rogel's own experts have not visited the scene on cross-examination to discredit any distance opinions given. The available body cam footage and photographs can appropriately apprise the jury on what the scene of the incident looked like during trial.

**ORDER**

Accordingly, **IT IS ORDERED** that:

1.  Defendant City of Bozeman's Motion for Partial Summary Judgment (Doc. 90) is **DENIED**.

2.  Defendant Officers Ybarra's, Chaffins's, Garfield's, Helsby's, Jeppson's, Marvich's, and Ogden's Motions for Summary Judgment (Docs. 100, 102, and 104.) are **DENIED**, in part, and **GRANTED**, in part.

    a.  Officers are not entitled to qualified immunity or summary judgment on Rogel's excessive force § 1983 claims.

    b.  Officers are entitled to summary judgment on Rogel's Fourteenth Amendment Substantive Due Process Claim.

    c.  Officers are entitled to summary judgment on Rogel's state law claims.

    d.  Officers are not entitled to summary judgment on Rogel's punitive damages claims.

3.  Defendants' Motion for a Jury Site Visit (Doc. 114) is **DENIED**.

    DATED this 9th day of March 2026.

_____
Brian Morris, Chief District Judge
United States District Court